Gilbert ANDREWS Plaintiff,

v.

THE AMERICAN NATIONAL RED CROSS, INC., the El Paso Chapter of the American National Red Cross, Carmen Ruiz Defendants;

Carmen Ruiz, Counter–Plaintiff,

v.

Gilbert Andrews Counter–Defendant.

No. EP–99–CA–70–DB.

United States District Court, W.D. Texas, El Paso Division.

March 16, 2001.

Thomas E. Stanton, Christopher A. Antcliff, Stanton & Antcliff, P.C., El Paso, TX, for Gilbert Andrews.

Mark N. Osborn, Kemp Smith, P.C., El Paso, TX, Michael A. Schlanger, Daniel D. Barnowski, Sonnenschein Nath & Rosenthal, Washington, D.C., for American Nat. Red Cross and El Paso Chapter of the American Nat. Red Cross.

Hector M. Zavaleta, Hector M. Zavaleta, P.C., El Paso, TX, for Carmen Ruiz.

## MEMORANDUM OPINION AND ORDER

BRIONES, District Judge.

On this day, the Court considered the following motions that Defendants the American National Red Cross, Inc., The El Paso Chapter of the American National Red Cross and Carmen Ruiz filed in the above-captioned cause:

(I) *Two Motions to Dismiss:* Defendants filed a "Motion to Dismiss the RICO Claims of Plaintiff's 'Fifth Amended Complaint,'" (the "RICO Motion to Dismiss") and a "Motion to Dismiss the Non–RICO Claims of Plaintiff's 'Fifth Amended Complaint'" (the "Non–RICO Motion to Dismiss") (collectively, the "instant Motions to Dismiss"), on March 16, 2000.[1] Plaintiff Gilbert Andrews filed a "Comprehensive Response to Defendants' Motions to Dismiss the Rico and Non–Rico Claims in

---

1. In general, each of the motions the Court considers herein, as well as substantially all filings the Court lists in the Procedural History section, were filed only after the Court granted leave to file in excess of the ten-page limit for motions set forth in Local Court Rule CV–7. To the extent that a paper required leave of court in order to be filed, the Court refers to the date on which an order was entered granting such leave, not the date on which the document was "received" by the District Clerk.

Plaintiff's Fifth Amended Complaint" on March 28, 2000. Defendants thereafter filed a separate Reply each as to the RICO Motion to Dismiss and the Non–RICO Motion to Dismiss on April 10, 2000. Later, Defendants filed a letter brief to the Court on May 9, 2000. Plaintiff filed a "Response to the Defendants' Arguments Contained in Defendants' May 9, 2000 Letter to the Court" on May 11, 2000.[2]

**(II)** *Two Motions for Summary Judgment:* Defendants filed a "Motion for Partial Summary Judgment" on August 14, 2000, (the "First Summary Judgment Motion"). Plaintiff filed a "Response to Defendants' Motion for Partial Summary Judgment" on August 23, 2000. Defendants filed a "Reply Brief in Support of Their Motion for Partial Summary Judgment on the Claims That Arise out of Andrews' Allegedly Improper Incarceration in Mexico" on September 11, 2000.

Defendants also filed a "Motion for Partial Summary Judgment on Plaintiff's Fifth Amendment, Conversion, Defamation and False Imprisonment Claims" on August 24, 2000 (the "Second Summary Judgment Motion").[3] Plaintiff filed a "Response to Defendants' Motion for Partial Summary Judgment on Plaintiff's Fifth Amendment, Conversion, Defamation and False Imprisonment Claims" on August

30, 2000. Thereafter, Defendants filed an "Amended Motion for Partial Summary Judgment on Plaintiff's Fifth Amendment, Conversion, Defamation and False Imprisonment Claims" on September 15, 2000.

**(III)** *One Motion for Judgment as a Matter of Law:* Defendants filed a "Motion for Judgment as a Matter of Law" on October 18, 2000 (the "JMOL Motion"). That same day, Plaintiff filed a "Summary of Evidence Demonstrating a Prima Facie Case of Conspiracy by Defendants" (the "JMOL Summary of Evidence").[4]

## FACTUAL BACKGROUND [5]

This lawsuit arises out of Plaintiff's business dealings in Mexico. Plaintiff had a business in El Paso, Texas selling used medical equipment in the United States and Mexico. In September or October 1994, Plaintiff arranged to sell certain equipment to the Mazatlan Delegation ("Mazatlan Delegation") of the Mexican Red Cross.

At some point, there was a dispute between the Mazatlan Delegation and Plaintiff over the equipment contracted for. In April 1998, Plaintiff went to Ciudad Juarez, Chihuahua, Mexico ("Juarez") and was arrested by Mexican authorities. The Mexican authorities transported Plaintiff to Mazatlan, Mexico, to stand trial under

---

**2.** As detailed below, on September 21, 2000, the Court entered an Order, without setting forth any reasoning, granting Defendants' RICO Motion to Dismiss and granting in part and denying in part Defendants' Non–RICO Motion to Dismiss. The Court's discussion herein as to the instant Motions to Dismiss explains further the Court's reasons for those rulings.

**3.** As detailed in the Summary Judgment section of this Memorandum Opinion, the First Summary Judgment Motion addresses Plaintiff's RICO claim as well as Plaintiff's common law claims. However, the Second Summary Judgment Motion also attacks Plaintiff's common law claims, albeit on different bases.

**4.** As detailed below, the Court orally delivered its ruling on Defendants' JMOL Motion from the bench. Herein, the Court further explains its reasoning.

**5.** Because this Memorandum Opinion deals with three different types of motions, each bearing a different standard with respect to facts and how the Court views them, in this section the Court merely sets forth the general factual background for this lawsuit. Below, the Court adds more detailed facts as necessary in relation to the appropriate standard for each motion.

charges the Mazatlan Delegation filed against Plaintiff in a Mexican court regarding the medical equipment sale.

Plaintiff was held in a Mexican prison for 241 days pending a trial. In December 1998, the Mexican authorities released Plaintiff and charges against him were dropped. Plaintiff returned to the United States and filed the instant lawsuit.

## PROCEDURAL BACKGROUND

Plaintiff commenced the instant action by filing an "Original Petition" in the 171st Judicial District Court of El Paso County, on February 15, 1999. He sued the American National Red Cross ("American Red Cross"); the El Paso Chapter of the American National Red Cross ("El Paso Chapter"); and Carmen Ruiz ("Ruiz"), an El Paso Chapter employee, alleging a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, stating three predicate acts—three "counts." A week later, on February 22, 1999. Plaintiff filed a "First Amended Petition" in that same Court, adding a fourth "count" of RICO violations, as well as two common law causes of action for defamation and one for civil conspiracy to defraud.

Defendants removed the case to this Court by filing a "Notice of Removal" on March 2, 1999. On March 11, 1999, Plaintiff filed a "Second Amended Complaint" to add yet more RICO "counts" (for a total of six), a common law claim for conversion, and two claims under the Fifth Amendment to the United States Constitution for unlawful taking of property without just compensation and deprivation of liberty without due process of law. Plaintiff also added as defendants "George Walker, M.D., and other Unknown Employees, Officers and Directors of the American National Red Cross."

On April 8, 1999, Ruiz filed a Motion for a More Definite Statement of Plaintiff's RICO and other fraud-based allegations. The American Red Cross and the El Paso Chapter filed a similar motion on April 12, 1999. The Court granted Ruiz's motion by Order entered April 12, 1999, and thereafter denied as moot the Red Cross and El Paso Chapter's motion. Through that April 12 Order, the Court obliged Plaintiff to file a "case statement" to set forth in detail the facts upon which Plaintiff based his RICO claim. Plaintiff complied, filing a "RICO Case Statement" on April 27, 1999.

All named defendants joined in a Motion to Dismiss the RICO claims, filed May 20, 1999, as well as a Motion to Dismiss the Non–RICO claims filed May 21, 1999. On July 1, 1999, Plaintiff filed an "Omnibus Response to Defendants' [May 21, 1999,] Motions to Dismiss." Thereafter, the Court granted leave to Plaintiff to file a "Second Amended Complaint"[6] and First Amended RICO Case Statement" by Order entered July 8, 1999, and, on that basis, denied as moot Defendants' May 1999 Motions to Dismiss by a separate Order entered that day. The July 8, 1999, "Second Amended Complaint" added RICO-related factual allegations and a common law claim for false imprisonment.

For a third time, all Defendants[7] joined in a "Motion to Dismiss the RICO Claims of Plaintiffs' 'Second Amended Compli-

---

6. As told above, Plaintiff already had filed a "Second Amended Complaint" in March 1999. Hence, the July 1999 "Second Amended Complaint" was actually a *third amended* complaint.

7. By Order entered August 3, 1999, the Court dismissed Defendant George Walker as a party to this case pursuant to Federal Rule of Civil Procedure 41 and a "Motion to Dismiss" *Plaintiff* filed on July 30, 1999. Hence, although Walker joined in the new motions to

ant,' " [8] and a "Motion to Dismiss the Non–RICO Claims of Plaintiff's 'Second Amended Complaint,' " both filed July 22, 1999. In turn, Plaintiff filed an "Omnibus Response" to those motions on August 2, 1999. Defendants then filed a Reply Brief as to the Motion to Dismiss the Non–RICO Claims on August 12, 1999, and a Reply Brief as to the Motion to Dismiss the RICO Claims on August 16, 1999.

As if by force of habit, Plaintiff moved to amend his complaint again on October 20, 1999, through a "Motion for Leave to File Plaintiff's Fifth Amended Complaint." [9] Through a November 12, 1999, Order, the Court granted Plaintiff's Motion for Leave despite strong opposition from Defendants. The Court further denied as moot Defendants' then-pending motions to dismiss. Through the same Order, the Court stayed this case until January 3, 2000, due to the medical condition of Ruiz's attorney. Later, by Order entered January 4, 2000, the Court sua sponte extended the stay to February 7, 2000.

On March 1, 2000, Plaintiff filed a "Motion for Entry of Default Judgment," contending that Defendants had neither answered his "Fifth Amended Complaint" nor filed a responsive pleading. Defendants responded to that motion on March 2, 2000, and the Court entered an Order denying Plaintiff's motion on March 3, 2000.

Previously, on February 23, 2000, Ruiz filed "Counterclaims against Gilbert Andrews," alleging slander and libel. Plaintiff moved to strike Ruiz's Counterclaims on March 1, 2000, on the basis that Ruiz had not yet answered Plaintiff's "Fifth Amended Complaint." The Court denied Plaintiff's motion to strike Ruiz's Counterclaims by Order entered March 6, 2000, after Ruiz filed a response to the motion on March 3, 2000. Counter–Defendant Gilbert Andrews filed an Answer to Ruiz's Counterclaims on March 8, 2000.

Not unexpectedly, Defendants filed the instant Motions to Dismiss, and Plaintiff responded, as set forth above. Defendants later filed the instant Summary Judgment Motions.

On October 10, 2000, this cause came on for trial. At that point, the Court already had entered an order granting Defendants' RICO Motion to Dismiss and granting in part Defendants' Non–RICO Motion to Dismiss. The Court also already had informed the Parties how it would rule on the instant Summary Judgment Motions. Hence, Plaintiff's case went to trial on only one claim, his common law claim for civil conspiracy to defraud. A jury of nine was selected, duly sworn and seated on October 10. Plaintiff began presenting evidence that day and continued for four days. He called sixteen witnesses,[10] in-

dismiss, he was not around to see their resolution.

**8.** See footnote 6, *supra.*

**9.** For some reason, Plaintiff could not keep a straight count of the number of complaints filed in this cause. Although he sought to file a "Fifth Amended Complaint," the previous complaint was labeled "Second," albeit the second "Second." To be clear, the complaint Plaintiff sought to file could have been labeled "Fourth Amended Complaint," but it was actually the *fifth* rendering of a complaint.

In any event, this "Fifth Amended Complaint" is the last one Plaintiff filed in this cause: it is the pleading Defendants attack through the instant motions.

**10.** In addition to Plaintiff, the following persons testified at trial in person: Carmen Ruiz; Margaret Randle; Beatriz Linan; Gilbert Andrews, Jr.; John Birkmeier; Vanessa Andrews; Veronica Torres–Torres; Jose Reyes Ferriz; George Walker; Marisela Andrews; Sergio Stevens; Adelaida Stevens; and Mitch Moss. Plaintiff presented *the testimony of* Alberto Osuna–Rojas and Blanca Alicia Alarcon through deposition transcripts.

cluding Plaintiff, and submitted some sixty-two exhibits.

On October 17, 2000, Plaintiff rested. The jury was excused for the day and the Court scheduled a hearing the following morning for Defendants to move for judgment as a matter of law, as they informed the Court they would do. The next morning, Defendants filed their written JMOL Motion and Plaintiff filed his written JMOL Summary of Evidence, summarizing the evidence he brought forward that he believed would defeat Defendants' motion. The Court heard arguments at length from all Parties with respect to the motion and orally indicated that the Defendant's JMOL Motion would be granted. Thereafter, Ruiz agreed on the Record to dismiss her Counterclaims against Gilbert Andrews as Counter–Defendant without prejudice conditioned upon his agreement on the Record that he would waive any statute of limitations defense in the future, pending the outcome of Plaintiff's anticipated appeal.

Plaintiff filed a Notice of Appeal on December 6, 2000, which will be effective when the Court enters a final judgment, pursuant to Federal Rule of Appellate Procedure 4.

## DISCUSSION

### I. MOTIONS TO DISMISS

Through his Fifth Amended Complaint, which incorporates his amended RICO Case Statement, Plaintiff sets forth the following alleged predicate acts:

(1) transporting stolen goods in foreign commerce, in violation of 18 U.S.C. § 2314, by transporting Plaintiff's inventory, which he alleges is a "document of title";

(2–3) engaging in a scheme or artifice to defraud with the use of the United States mails in violation of 18 U.S.C. § 1341 and by wire in violation of 18 U.S.C. § 1343, by falsely representing that the medical equipment Plaintiff sold to the Mazatlan Delegation constituted a donation;

(4) making and delivering a false certificate or writing which declared that the request to Mexican authorities not to impose tariffs was being made pursuant to international treaties to which the United States is a signatory, and submitting such certificate or writing in an official matter, in violation of 18 U.S.C. § 1018;

(5) filing a false report to the United States Department of Commerce (form number 7525–V), in violation of 18 U.S.C. §§ 1001 and 1343, 13 U.S.C. § 305 and 22 U.S.C. § 401;

(6) making statements in furtherance of a scheme to extort which involves foreign commerce, in that Melissa Hurst, an American Red Cross employee, obtained a promise from Plaintiff that he would stop contacting American Media, by stating that the American Red Cross would help Plaintiff get out of prison, all in violation of 18 U.S.C. §§ 872 and 875(d);

(7–8) receiving by mail a solicitation to create a false exportation document on or about August 1993, and completing a false "shipper's export declaration" using the United States mails and a telephone and telecopier, all in violation of 18 U.S.C. §§ 1001, 1341 and 1343;

(9–10) receiving, intercepting and concealing a lawful export declaration and creating a false export declaration on or about December 1994, all in violation of 18 U.S.C. §§ 1001 and 1341;

(11) providing a letter in or about November 7, 1991, that falsely declared the sale of an ambulance as a donation in order to avoid payment of tariffs and other taxes, in violation of 18 U.S.C. § 1343;

(12) providing a letter in or about November 8, 1991, that falsely declared the sale of (another) ambulance as a donation in order to avoid payment of tariffs and other taxes, in violation of 18 U.S.C. § 1341; and

(13) falsely declaring in or about July 1993 to the United States Customs Service that a certain Mexican Red Cross official was authorized to act on behalf of the American Red Cross and falsely declaring on a "United States Shipper's Export Declaration" that the American Red Cross was the origin of three boxes of medicine, all in violation of 18 U.S.C. §§ 1001 and 1343.

Defendants attack the RICO claim through their RICO Motion to Dismiss on various bases.

Apart from the RICO claim, Plaintiff also sets out two claims based on the Fifth Amendment: a taking of his property without just compensation, and a deprivation of liberty without due process. Finally, Plaintiff alleges four tort-based claims under Texas law: defamation; conversion; false imprisonment; and civil conspiracy to defraud. Defendants attack those claims through their Non–RICO Motion to Dismiss.

### A. Facts Pertinent to Motions to Dismiss [11]

Plaintiff operated a business in El Paso selling used medical equipment in the United States and Mexico. In September or October 1994, Plaintiff entered into negotiations with representatives of the Mexican Red Cross to sell certain medical equipment to its Mazatlan Delegation. Plaintiff provided a list of the equipment and the parties agreed to a price of

$130,000.00. At some point, the Mexican Red Cross issued a letter of credit for payment to Plaintiff. Plaintiff made draws on the letter of credit using a form of sales invoice.

The Mexican Red Cross informed Plaintiff that it would arrange for the lawful importation of the goods into Mexico. However, Plaintiff alleges, the president of the Mazatlan Delegation informed Plaintiff that he intended to avoid paying import tariffs to Mexico, approximately $40,000.00. Plaintiff alleges that he pointed out the illegality of that plan and offered to help the Mazatlan Delegation arrange legal importation. The parties to the transaction agreed that the Mazatlan Delegation would take receipt of the goods in El Paso at Plaintiff's warehouse. Plaintiff provided to the Mazatlan Delegation a written inventory of the equipment.

Meanwhile, Plaintiff alleges, unbeknownst to him, the Mazatlan Delegation was making plans to carry out its scheme to defraud the government of Mexico through an ongoing criminal enterprise involving the American Red Cross, the Juarez Delegation of the Mexican Red Cross ("Juarez Delegation") and its Director, Dr. Luis Rauda Esquivel ("Rauda"), and other unnamed American Red Cross chapters, their officers, directors and employees. One of the alleged purposes of that criminal enterprise was to avoid payment of import tariffs by falsely designating imported goods as "donated" from the American Red Cross to the Mexican Red Cross (free from tariffs). Such false designations allegedly occurred by converting title from the applicable vendor to the American Red Cross and/or the particular chap-

---

**11.** Plaintiff's Fifth Amended Complaint measures some sixty pages. The Court need not detail every fact set forth therein, only those pertinent to the instant motions to dismiss. Moreover, in keeping with the standard the Court must apply on a Rule 12(b)(6) motion, the Court herein does not make any *finding* as to any fact set forth in this section. Rather, the facts the Court sets forth are as Plaintiff alleges them, taken as true.

ter. Plaintiff alleges that the inventory attached to the donation letter constitutes a "document of [t]itle" pursuant to the Texas Business and Commerce Code section 1.201(15) (setting forth provisions of the Uniform Commercial Code).

In February 1995, Mazatlan Delegation Chairman of the Board Oses Cole–Isunza ("Cole–Isunza") sent a letter to the El Paso Chapter asking that the El Paso Chapter issue a "donation letter." Cole–Isunza wrote as follows:

> To equip our new Hospital in Mazatlan, we have acquired from Mr. Gilbert Andrews ... various medical equipment which has cost us approximately U.S. 130,000.00.
>
> In order to import such equipment to Mexico we require to present custom authorities a letter written by an American charitable organization stating that such equipment is given as a donation to DIF Municipal in Mazatlan, which in turn will donate it to this Red Cross.

In response, Ruiz drafted and mailed a letter dated February 10, 1995, which stated that the equipment (a copy of the inventory Plaintiff forwarded to the Mazatlan Delegation was attached to the letter) was being donated from the American Red Cross to the Mexican Red Cross (hereinafter, the "donation letter" or "February 10, 1995, donation letter"). Plaintiff alleges that Ruiz knew at that time that the donation letter was false, that the equipment actually was being purchased from Plaintiff and that her letter's true purpose was for the Mexican Red Cross to defraud the government of Mexico. Ruiz also filled out a "Shipper's Export Declaration" stating that the origin of the goods was the American Red Cross.

Rauda went to Plaintiff's warehouse in El Paso after Cole–Isunza arranged for Rauda to pick up the equipment. He loaded the equipment into a truck and drove off. The Mexican customs authorities allegedly did not impose any tariff on the equipment upon entering Mexico.

When the equipment arrived in Mazatlan, much of it was in disrepair. According to Plaintiff, the damage resulted from transportation to Mazatlan from El Paso. A contractual dispute arose about who was responsible for the equipment and the Mazatlan Delegation filed a criminal complaint against Plaintiff with Mexican authorities, alleging against Plaintiff, theft.

On April 15, 1998, the Juarez Delegation allegedly contacted Plaintiff to purchase additional medical equipment. Plaintiff agreed to meet with Juarez Delegation representatives in Juarez. When he arrived, Mexican authorities arrested Plaintiff and charged him with theft and criminal fraud. Plaintiff was transported to Mazatlan for court proceedings, where he was held in a prison for 241 days.

On December 11, 1998, Mexican authorities released Plaintiff. He filed the instant lawsuit, alleging that the American Red Cross and the El Paso Chapter committed numerous similar schemes prior to its dealings with Plaintiff. Specifically, Plaintiff alleges that Defendants falsely characterized as a donation the purchase of certain construction equipment in August 1994, certain x-ray medical equipment in November 1994, and two motor vehicles in November 1991. Furthermore, Plaintiff alleges that various American Red Cross employees acted to cover up the conspiracy.

### B. Standard on Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss an action for "failure to state a claim upon which relief can be granted." Under that rule, the Court must decide whether the facts alleged, if true, would entitle the plaintiff to some legal remedy. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2

L.Ed.2d 80 (1957). In general, a court should not dismiss a claim under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 45–46, 78 S.Ct. at 102.

The Court must limit its inquiry to facts stated in Plaintiff's Complaint and the documents either attached to or incorporated in the Complaint. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996). Further, the Court must accept as true all material allegations in the complaint, as well as any reasonable inference to be drawn from them, *see Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), and must review those facts in a light most favorable to the plaintiff. *See Piotrowski v. City of Houston,* 51 F.3d 512, 514 (5th Cir.1995); *Garrett v. Commonwealth Mortgage Corp. of Am.,* 938 F.2d 591, 593 (5th Cir.1991). The Court also may "consider matters of which [it] may take judicial notice." *Lovelace,* 78 F.3d at 1017–18, and matters of public record. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1990).

## C. Discussion of Motions to Dismiss

The Court addresses Defendants' RICO Motion to Dismiss and Non–RICO Motion to Dismiss separately.

### 1. RICO Motion to Dismiss

RICO creates a civil claim and remedy for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C.A. § 1964(c) (West 2000). Although § 1962 prohibits various acts, as relevant here, the Fifth Circuit has reduced [subsections (c) and (d) of § 1962] to their simplest terms to mean that:

. . . .

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections . . . (b), or (c).

*St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 439 (5th Cir.2000) (quoting *Crowe v. Henry,* 43 F.3d 198, 203 (5th Cir.1995)). In other words, " § 1962(c) prohibits 'any person employed by or associated with any enterprise' from participating in or conducting the affairs of that enterprise through a pattern of racketeering activity[,]" and "[u]nder § 1962(d), a person cannot conspire to violate subsection[ ] . . . (c)." *St. Paul,* 224 F.3d at 445, 447. Plaintiff alleges that the American Red Cross [12] violated both sub-sections (c) and (d).

Defendants state at least seven grounds for dismissing Plaintiff's RICO claims, not all of which the Court agrees with. For the sake of brevity, the Court only addresses those grounds that the Court finds persuasive and, therefore, merit dismissal. The Court denies summarily all grounds Defendants state which are not discussed herein. [13] Furthermore, the Court does not address Defendants' arguments in any particular order.

#### a. Statutory elements

Defendants contend that Plaintiff cannot meet the various statutory elements needed to state a RICO claim.

---

**12.** As further explored below, Plaintiff asserts a RICO claim only against the American Red Cross.

**13.** The Court does, however, pause occasionally to point out in various footnotes how several of Defendants' arguments fail, simply because it is worthy of note.

■ Every RICO claim requires facts which demonstrate " '(1) a *person* who engages in (2) a *pattern of racketeering activity* (3) connected to the acquisition, establishment, conduct or control of an *enterprise.*' " *St. Paul,* 224 F.3d at 439 (quoting *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 242 (5th Cir. 1988)) (emphasis added). "[E]ach concept is a term of art which carries its own inherent requirements of particularity." *Elliott v. Foufas,* 867 F.2d 877, 880 (5th Cir.1989).

As defined in the RICO statute, a " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C.A. § 1961(3) (West 2000). "The RICO person in a civil or criminal RICO action is the defendant." *Crowe,* 43 F.3d at 204. The term "racketeering activity," as relevant here, "means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud). . . . section[ ] 2314 . . . (relating to interstate transportation of stolen property)." 18 U.S.C.A. § 1961(1).[14] A " 'pattern of racketeering' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." *Id.* § 1961(5). Finally, an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).

**(1) Pattern of racketeering activity**

Defendants contend that Plaintiff cannot show a "pattern" of racketeering activity because he cannot show at least two predicate acts of racketeering. Plaintiff listed thirteen predicate acts.

First of all, Plaintiff churns out a significant number of alleged predicate acts which are not specifically set forth in § 1961(1), the statutory definition of what constitutes "racketeering activity." Those alleged acts cannot, as a matter of law, constitute predicate acts. Hence, Plaintiff's fourth and sixth alleged predicate acts are wholly without the RICO statute because no section of Title 18 alleged therein— §§ 1018, 872 and 875(d)—is specifically listed under RICO to constitute an act of racketeering. Further, to the extent any of Plaintiff's alleged predicate acts points to a statute not listed in § 1961(1) in conjunction with one that is therein listed, the non-listed statute will be wholly ignored.[15]

■ That leaves Plaintiff with one act of transporting stolen goods in foreign commerce and a total of eight acts of fraud (three acts of mail fraud and five acts of wire fraud). As to the fraud allegations, Defendants contend that Plaintiff cannot use mail and wire fraud as predicate acts if Plaintiff was not the target of the fraud or was the target but did not rely on any misrepresentation. Defendants contend that any misrepresentation, therefore, must flow from Defendant to Plaintiff. The Court agrees, but addresses this argument below as a component of the "proximate cause" analysis, as it rightly should

---

**14.** The actual text of § 1961(1) runs several pages and lists some seventy-three crimes under Title 18, as well as various acts chargeable under various other titles. In short, the list is long.

**15.** Thus, in Plaintiff's discourse on the alleged predicate acts, any reference to 18 U.S.C. § 1001, 13 U.S.C. § 305 and 22 U.S.C. § 401 is not relevant, even when such allegations are coupled to a mail and/or wire fraud allegation. Such predicates will have to survive based on mail or wire fraud alone.

be. *See Summit Props. Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 560–61 (5th Cir.2000), *cert. denied,* 531 U.S. 1132, 121 S.Ct. 896, 148 L.Ed.2d 802 (2001) (noting that required showing of detrimental reliance in fraud-based predicate acts is consistent with Supreme Court precedent).

**16.** Plaintiff's allegation that Defendants transported *stolen goods* is premised on his claim that the inventory list constituted a "document of title" under Texas Business and Commerce Code § 1.201 and that Defendants "stole" that inventory. Section 1.201 provides:

> (15) "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

TEX. BUS. & COMM. CODE ANN. § 1.201(15) (Vernon Supp.2001). The Court does not believe that Plaintiff's "inventory" constitutes a "document of title." In addition, to use 18 U.S.C. § 2314 as a predicate act. Plaintiff would also have to show that Defendants knew that the inventory was "stolen, converted or taken by fraud" and that it indeed was. 18 U.S.C.A. § 2314 (West 2001). Even assuming the inventory does constitute a "document of title," as far as Plaintiff's facts go, Defendants appear to have purchased the document for $130,000.00. In any event, this is not so important, since Plaintiff cannot state a RICO claim based on one alleged predicate act of transporting stolen goods in foreign commerce.

**17.** Even if Plaintiff had two predicate acts, Defendants contend that Plaintiff cannot establish a "pattern" of such acts. A "pattern" requires "a demonstration that the racketeering predicates are related and amount to or pose a threat of continued criminal activity." *St. Paul.* 224 F.3d at 441 (citing *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,* 90 F.3d 118, 122 (5th Cir.1996)). "The continuous threat requirement may not be satisfied if no more is pled than that the person has

Without the alleged predicate acts based on mail and/or wire fraud, Plaintiff is left with one alleged predicate act—transporting stolen goods in foreign commerce (which itself is a tenuous allegation [16]). In short, one alleged predicate act is one too few.[17]

engaged in a limited number of predicate racketeering acts." *Crowe*, 43 F.3d at 204 (quoting *Delta Truck*, 855 F.2d at 242). "To establish a pattern of racketeering activity, the Supreme Court explained in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 231, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989), that a plaintiff 'must show that the racketeering predicates are *related,* and that they amount to or pose a threat of *continued criminal activity.*' " *Word of Faith,* 90 F.3d at 122 (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900).

Defendants argue that Plaintiff has not sufficiently shown that there is any specific threat of continued activity because the last activity took place over five years ago; all of the Chapter employees alleged to have participated in the scheme no longer are employed by the Chapter; and RICO is not concerned with short-term criminal conduct. For these purposes, the Court disagrees. " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. Closed-period allegations, however, cannot relate solely to a single transaction. *See Word of Faith,* 90 F.3d at 122–23. Here, Plaintiff alleges repeated false donation letter schemes, not part of the same transaction, taking place from at least 1991 to 1995. The Court finds that allegation sufficient to allege "continuity" and obviate any need to allege a threat of continuing criminal activity.

In a similar vein, Defendants contend that Plaintiff's claim fails because he has not alleged that the acts of racketeering are part of the American Red Cross's "regular way of doing business." The Court disagrees. Such an allegation is only required when the plain-

## (2) RICO person and RICO enterprise—distinctiveness

Defendants argue that Plaintiff cannot show that there was a RICO enterprise, as that term is defined in the statute, because the alleged enterprise is the same as the alleged RICO person.

■ In general, because subsection (c) "forbids any *person* employed by or associated with any *enterprise* from participating in or conducting the affairs of the enterprise through a pattern of racketeering activity," that claim requires that the RICO person be distinct from the RICO enterprise. *Crowe,* 43 F.3d at 205–06; *see also St. Paul,* 224 F.3d at 445; *In re Burzynski,* 989 F.2d 733, 741 (5th Cir. 1993). Thus, in order to state a violation of subsection (c), the alleged RICO person and the alleged RICO enterprise must be distinct. *See Crowe,* 43 F.3d at 205 (finding that plaintiff could not make claim for § 1962(c) violation "because there [was] not a sufficient distinction between the person and the enterprise" where the alleged RICO person was also part of the alleged association-in-fact RICO enterprise). In other words, an " 'enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation.' " *St. Paul,* 224 F.3d at 447 n. 16 (quoting *Brit-*

*tingham v. Mobil Corp.,* 943 F.2d 297, 300–02 (3d Cir.1991) (also citing *Old Time Enters., Inc. v. Int'l Coffee Corp.,* 862 F.2d 1213, 1215 (5th Cir.1989))).

■ Here, Plaintiff contends that the "persons" who allegedly took over the alleged "enterprise" were the American Red Cross, acting through its officers, Chapters and Employees, the Mazatlan Delegation, Cole–Isunza, Rauda, Jose Boroso Chavez, and various other employees of the American Red Cross and of the El Paso Chapter. Similarly, Plaintiff claims that the "enterprise" consisted of "the American Red Cross, acting through various chapters, officers, directors, and employees as described in response to question 5 [of the RICO Case Statement] above; the Mazatlan Delegation of the Mexican Red Cross; one or more other chapters of the Mexican Red Cross; and the Mexican Red Cross ... Oses Cole–Insunsa [*sic* ]... Dr. Luis Rauda Esquivel ... [and] Jose Boroso Chavez." Quite simply, a RICO person cannot employ or associate with itself. *See Crowe,* 43 F.3d at 206; *In re Burzynski,* 989 F.2d at 743; *Elliott,* 867 F.2d at 881, *Old Time,* 862 F.2d at 1217.[18] Hence, Plaintiff's claim must fail because there simply is no distinction in this case between the American Red Cross as RICO person—the puppeteer—and the American Red Cross as RICO enterprise—the puppet.[19]

tiff seeks to show that the pattern is an open period. *See id.* at 122 (noting that open period "may be where there exists a 'specific threat of repetition extending indefinitely into the future,' or 'where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business.' " (Quoting *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2903) (emphasis added)); *see also H.J. Inc.,* 492 U.S. at 250, 109 S.Ct. at 2906 (noting "threat of continuity" and "regular way of conducting" business was *alternative* proof available to plaintiffs). Hence, because the Court finds that Plaintiff sufficiently alleged closed-period continuity, Plaintiff need not also allege that the racketeering was Defendants' regular way of doing business.

**18.** Notwithstanding that clear rule, the Fifth Circuit in *St. Paul* fashioned a slim exception to allow a claim against an *individual* who is also a component of an association-in-fact enterprise. As the *St. Paul* court explained, "courts have routinely required a distinction when a corporation has been alleged as both a RICO defendant and a RICO enterprise, but a similar requirement has not been mandated when individuals have been named as defendants and as members of an association-in-fact RICO enterprise." *St. Paul.* 224 F.3d at 447. That rule does not apply here, since Plaintiff's claim is against the American Red Cross only.

**19.** Relatedly, Defendants contend that Plain-

### b. Proreximate Cause

### b. Proximate Cause

■ Another major hurdle Plaintiff faces, Defendants contend, is that Plaintiff cannot prove proximate cause under the facts he has alleged or can allege. It is settled that a RICO plaintiff must establish proximate causation. *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 265–66, 112 S.Ct. 1311, 1316–17, 117 L.Ed.2d 532 (1992) (rejecting argument that plaintiff can recover merely by showing "but for" causation of plaintiff's injury as too expansive a reading of statute's "by reason of" language); *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir.1989) ("Rather than construing section 1964(c) as imposing an artificial distinction between direct and indirect injuries, we believe that *Sedima*'s 'caused by' and 'flow from' language instructs us to employ a traditional causation analysis in determining whether a RICO plaintiff has been injured 'by reason of' a section 1962 violation.") (Referring to *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Proximate cause in RICO cases bears the same meaning as in any other type of case where proximate cause is an element. *See Holmes*, 503 U.S. at 268, 112 S.Ct. at 1318 ("[W]e use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts."). As the Supreme Court concluded in *Holmes*,

"[a]llowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation, which would not only burden the courts, but would also undermine the effectiveness of treble-damages suits.'" *Id.* at 274, 112 S.Ct. 1311 (quoting *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 545, 103 S.Ct. 897, 912, 74 L.Ed.2d 723 (1983)) (brackets from original removed).

■ That said, as a threshold matter, the Court notes that Plaintiff simply cannot recover for injuries that are not "to his business or property," since those are the only type of damages § 1964(c) allows a private litigant to assert. Hence, Plaintiff cannot recover under RICO for loss of liberty, "humiliation and embarrassment," "fear for his life and his eventual release," or "physical pain and impairment," for those do not constitute "business or property." However, to the extent that Plaintiff suffered losses to his business on an extrapolation that such losses were the consequence of the incarceration, which was proximately caused by Defendants' racketeering acts, Plaintiff could recover for those losses in theory.

### (1) Intervening causes

■ Defendants contend that Plaintiff cannot demonstrate proximate cause because certain events and/or individuals not

---

tiff cannot meet the enterprise element because as alleged, the association-in-fact does not have *an existence separate and apart from the pattern of racketeering.* The Court disagrees.

"[A]n association-in-fact enterprise 1) must have an existence separate and apart from the pattern of racketeering, 2) must be an ongoing organization and 3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Crowe*, 43 F.3d at 205 (quoting *Delta Truck*, 855 F.2d at 243). Plaintiff alleges that the association-in-fact consists of the

American Red Cross, the El Paso Chapter, the Mazatlan Red Cross, the Mazatlan Delegation and several other chapters and that their association was for the purpose of arranging tariff-free imports into Mexico via the predicate acts of racketeering. However, Plaintiff has alleged (or at least implied, which is sufficient on a motion to dismiss) and might be able to prove that the alleged enterprise also arranged for lawful donations and other exports into Mexico that did not constitute a § 1961(1) act of racketeering. Hence, the Court will not dismiss Plaintiff's claim on this basis.

part of the alleged RICO enterprise broke the chain of causation that led to his incarceration. The Court agrees.

■ As a matter of general principles of proximate causation, a tortfeasor cannot be held liable for unforeseeable risks and injuries which have no direct relation between the injury and the injurious conduct alleged. *See Holmes*, 503 U.S. at 268–69, 112 S.Ct. at 1317–18. Furthermore, the "presence of intervening factors breaks the causal chain between predicate acts and injury, thereby precluding a proximate cause finding." *Texas Carpenters Health Benefit Fund IBEW–NECA v. Phillip Morris*, 21 F.Supp.2d 664, 674 (E.D.Tex. 1998) (discussing *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 149 (5th Cir.1997), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000)); *see also Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 240 (2d Cir.1999) ("[T]he direct injury test can be seen as wisely limiting standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties.").

Here, even accepting Plaintiff's facts—that to save $40,000.00, the American Red Cross risked breaking Mexico's tax and tariff laws by, as Plaintiff puts it, "tak[ing]

its chances by bringing the medical goods into the country without registering the goods lawfully, or paying tariffs"—the American Red Cross could not possibly have foreseen that the Mexican authorities would arrest *Plaintiff*, hold him without bail, and prosecute Plaintiff under Mexico's laws. If anything, the American Red Cross could anticipate that its own personnel could be arrested.[20] Sure, Plaintiff contends that Defendants had to "cover up" their scheme by continuing to insist that the transaction was a donation and hiding the fact that Plaintiff was the true source of the goods. However, even assuming Defendants acted to cover up, those allegations are not sufficient to show that the injury flowed from the alleged racketeering acts or was a foreseeable consequence of those acts. Moreover, the Mexican government was a third party whose independent action to imprison Plaintiff broke the chain of causation between Defendants' predicate acts and Plaintiff's alleged injury.

### (2) Reliance

As to Defendant's claim that Plaintiff cannot show any reliance on any alleged mail or wire fraud,[21] the Court is persuaded.

■ "[W]hen civil RICO damages are sought for injuries resulting from fraud, a

---

20. Moreover, Plaintiff's theory of the false donation importation scheme simply would not implicate Plaintiff in the scheme. Imagine Rauda driving up to the customs house in Mexico in a truck loaded with medical equipment. He presents the American Red Cross donation letter and exportation documents, which Plaintiff alleges should have had *his* name as the "source" or "origin" of the goods. The ever-vigilant Mexican customs agent notices something strange about the paperwork and starts asking questions. Rauda, who is only assisting Cole–Isunza, confesses that the whole scheme was cooked up for the Mexican Red Cross to save $40,000.00 in tariffs. At what point does Rauda mention

the name Gilbert Andrews? Even if Rauda did confess that the equipment was purchased from Plaintiff, how is Plaintiff implicated at all?

21. Actually, Defendants contend that Plaintiff's mail and wire fraud predicate act allegations fail as a matter of the heightened pleading under Rule 9(b). However, as noted above, "justifiable reliance" is more appropriately a part of the proximate cause analysis. *See Summit Props.*, 214 F.3d at 558–59 ("The question before us is whether a plaintiff's reliance on the predicate mail or wire fraud is necessary *in order to establish proximate causation.*" (Emphasis added)).

general requirement of reliance by the plaintiff is a commonsense liability limitation." *Summit Props.*, 214 F.3d at 562.[22] Although the mail and wire fraud crimes do not require reliance as an element of criminal prosecution, *see Neder v. United States*, 527 U.S. 1, 24–25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999), in a RICO claim 'based on wire or mail fraud as a predicate act, the plaintiff must show that the particular misrepresentation constituting such fraud was *directed at the plaintiff* and that *he relied on the misrepresentation. See Summit Props.*, 214 F.3d at 559. Most circuits agree. *See id.* at 560 n. 16 (setting forth cases from other circuits).

■ Here, Plaintiff repeatedly alleges that the scheme was designed to defraud the Mexican authorities of tariff and other tax revenue.[23] Clearly, Plaintiff was not the target[24] of the scheme, and he was never involved with any of the alleged predicate acts that predate his sale of medical equipment to the Mazatlan Delegation—namely, predicate acts seven through thirteen. Nor does Plaintiff allege that he was aware of any misrepresentation (and therefore relied upon it). Indeed, Plaintiff repeatedly claims that he had *no knowledge* of the scheme. Moreover, Plaintiff's claim of mail fraud boils down to various allegations that the alleged members of the enterprise conducted their scheme to defraud the Mexican government through documents shuffled about by mail and fax. However, Plaintiff does not contend that Defendants ever used the mails and/or wires to send *him* any document in furtherance of any scheme to defraud.

The only representation directed to Plaintiff that he arguably could have relied

---

22. Recently, the Fifth Circuit published *Procter & Gamble Co. v. Amway Co.*, 242 F.3d 539 (5th Cir.2001). Although the Court did not rely on that case when deciding the instant motion. *Procter & Gamble* further supports the Court's analysis. There, citing *Summit Properties*, the court first noted that "[i]n civil RICO claims in which fraud is alleged as a predicate act, reliance on the fraud must be shown." *Procter & Gamble Co.*, 242 F.3d at 564. Notwithstanding, the court also acknowledged "a narrow exception to this rule" that " 'a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by fraud directed at the plaintiff's customers.' " *Id.*, at 564–65 (quoting *Summit Props.*, 214 F.3d at 561). Hence, the plaintiff's claim in *Procter & Gamble* that the defendant spread evil rumors about the plaintiff and such rumors allegedly caused the plaintiff's customers to buy fewer of its products was sufficient to survive a motion to dismiss; the court reversed dismissal. *Id.*, at 565. However, where the plaintiff claimed that the defendant's creation of a pyramid marketing scheme to sell more of the defendant's product defrauded the plaintiff of additional sales, the *Procter & Gamble* court upheld dismissal because "injury to [the plaintiff] did not flow directly from such inducements. Further there are too many intervening factors for proximate causation to be proven [on that claim]. Allowing RICO claims for such tenuous causation would open floodgates . . . ." *Id.*, at 565.

23. For example, Plaintiff alleges the following in his Case Statement: "The common plan among the participants in the conspiracy . . . was to evade the payment of import tariffs or other taxes by appearing to be furthering the business of the charity organizations . . . ." Indeed, Plaintiff never alleges that the plan ever involved defrauding him, although he contends that that was a necessary consequence of acts done in furtherance of the scheme.

24. At one point, Plaintiff does state off-hand that Cole–Isunza "identifies specifically that the *victims* of the criminal conspiracy would be *Gilbert Andrews* and the Mexican Government" (emphasis added) in his February 2, 1995, letter to Ruiz. However, the quoted text of that letter (that followed) does not bear out such an allegation. The letter neither uses the term "victim" nor describes any scheme. Only by the grandest stretch of inference could that statement be read to mean that Plaintiff alleges he was the intended victim of Defendants' alleged fraud. Hence, the Court ignores it.

upon was an alleged statement that Rauda (a member of the alleged enterprise)[25] made to Plaintiff, that the goods would be lawfully imported pursuant to a "franchise" with the Mexican Red Cross.[26] With respect to the Rauda statement, unless that misrepresentation was made *through the mails or by wire*, it cannot, as a matter of law, constitute mail or wire fraud and, hence, does not amount to an act of racketeering. *See Tel–Phonic Svcs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir.1992) ("Misrepresentations that occurred at a meeting do not constitute wire of mail fraud ... and thus could not constitute racketeering activity."). Further, to the extent that Plaintiff might allege that the "lawful 'franchise'" statement was also made via mail and/or wire, Plaintiff does not state the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir.1997) (addressing specificity level required when making fraud claims). Hence, the Rauda statement cannot save Plaintiff's mail/wire predicate acts. Moreover, Plaintiff does not list that statement as a predicate act.

Even accepting as true Plaintiff's allegation that Defendants engaged in a scheme to defraud and used the mails and wires to further that scheme, because Plaintiff's own allegations make clear that Defendants did not have Plaintiff in the crosshairs of such a scheme, the Court is of the opinion that Plaintiff cannot state a claim based on fraud by mail and/or wire in violation of 18 U.S.C. §§ 1341 and/or 1343 because he cannot demonstrate proximate cause as to those alleged fraud-based predicate acts.

Under the facts alleged, Plaintiff was injured, if at all, in too remote a fashion to allow recovery under RICO. Accordingly, the Court is of the opinion that Plaintiff's RICO claim should be dismissed because he cannot prove proximate cause. The Court does not address Defendant's other proximate cause arguments.[27]

**25.** Defendants contend that Rauda's statement is not relevant because Rauda is not a party to this action.

**26.** Specifically, Plaintiff alleges the following:
> 30. ... Dr. Rauda contacted Andrews and arranged to meet him at Andrews' warehouse to inspect the equipment.
> 31. Andrews had assembled the medical equipment and gave access to Rauda for his inspection of the equipment. Rauda informed Andrews that the goods were being imported under the terms of a special "franchise" with the Mexican Red Cross.

**27.** The Court does note, however, that certain of Defendants proximate cause arguments the Court does not address are at least grounded in applicable case law. For example, the Supreme Court in *Holmes* identified the following as reasons to require a proximate cause showing in RICO cases:
> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other independent factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since *directly injured victims* can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.
> *Holmes*, 503 U.S. at 269–70, 112 S.Ct. at 1318 (emphasis added) (internal citations removed).

Apparently Defendants had *Holmes* in mind when they prepared their RICO Motion to Dismiss, for Defendants' arguments mirror *Holmes*. Defendants point out that the Mexican authorities were more directly injured by the alleged scheme; and that trying to appor-

### c. Subsection (d) liability

■ Finally, the Court notes that Plaintiff cannot succeed on his § 1962(d) claim (for conspiracy) if the only injury he alleges "was caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO." *Beck*, 529 U.S. at 505, 120 S.Ct. at 1616. "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Crowe*, 43 F.3d at 206 (quoting *Tel–Phonic*, 975 F.2d at 1140).

■ Though Plaintiff "has pled the conclusory allegation that the defendants herein 'conspired,' nowhere does he allege facts implying any agreement to commit predicate acts of racketeering." *Crowe*, 43 F.3d at 206. Moreover, *Beck* stands for the proposition that a § 1962(d) plaintiff must do more than allege that there was a conspiracy to violate § 1962(c); he must allege that his injury was a direct result of a predicate act. Because the Court finds that there is no sufficiently-alleged [28] predicate act, the Court is of the opinion that Plaintiff's § 1962(d) claim, too, must fail because Plaintiff could not thereby be injured.

Furthermore, even if there were such a predicate act and Plaintiff could show some direct tie between that act and his alleged injuries, for the same reasons set forth above as to his § 1962(c) claim. Plaintiff cannot demonstrate proximate cause here.

Having considered every argument Defendants make, together with Plaintiff's responses, and viewing the facts alleged through Plaintiff's Fifth Amended Complaint in a light most favorable to Plaintiff, Plaintiff cannot state a claim for RICO violations.

### 2. *Non–RICO Motion to Dismiss*

Through their Non–RICO Motion to Dismiss, Defendants attack each of Plaintiff's non-RICO claims.

### a. Fifth Amendment Claims—Due Process and Takings

Plaintiff alleges that Defendants "invok[ed] the powers granted by Congress and the authority to act on behalf of the United States on matters of relief" (1) caus[ing] the loss of liberty of Gilbert Andrews without due process of law in violation of the Fifth Amendment;" and (2) "depriv[ed] Gilbert Andrews of property without [just compensation] in violation of the Fifth Amendment." [29]

tion damages between Defendants and such intervening actors would be too difficult. Although the Court need not ground its decision here on such arguments, the Court notes that those considerations add authoritative force to Defendants' argument that Plaintiff cannot prove proximate causation and, arguably could alone justify dismissing Plaintiff's RICO claim.

28. At best, the 18 U.S.C. § 2314 (transportation of stolen goods in foreign commerce) predicate act survives, as discussed above. However, Plaintiff does not allege any fact to indicate that any injury he sustained flowed directly from that predicate act.

29. Plaintiff's Complaint actually alleges Defendants "depriv[ed] Gilbert Andrews of prop-

erty *without due process of law*." (Emphasis added). Arguably that allegation could be read to state another due process claim rather than a takings claim. However, Plaintiff's factual allegations—that Defendants took Plaintiff's property for "their own use and benefit"—indicates that he meant to allege a takings claim. That is the claim Defendants attacked by the instant motion; and Plaintiff defended the claim as if it were a takings claim. Notwithstanding, the Court notes that to the extent Plaintiff alleges a due process claim regarding his *property*, such a claim would fail for the same reasons set forth below regarding his *liberty*-based due process claim.

### (1) Due Process

 The Fifth Amendment provides: "No person shall ... be deprived of life, liberty, or property, without due process of law...." U.S. CONST. amend, V. It is axiomatic that the Fifth Amendment's protections apply only to governmental entities or "governmental actors." *See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 542, 107 S.Ct. 2971, 2984, 97 L.Ed.2d 427 (1987); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (holding constitutional standards can apply to private entities if actions "fairly attributable" to government). The inquiry is not whether the defendant is a "government actor" generally, but whether the government directly coerced the specific action the plaintiff alleges harmed him, by significant encouragement or by maintaining the ability to control the defendant's conduct. *See San Francisco Arts*, 483 U.S. at 543–45 & n. 27, 107 S.Ct. at 2985–86 & n. 27; *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 398–400, 115 S.Ct. 961, 973–75, 130 L.Ed.2d 902 (1995). Nor does the inquiry focus solely on whether the defendant performs a so-called "traditional. government function." *See, e.g., San Francisco Arts*, 483 U.S. at 545, 107 S.Ct. at 2985. Government control is essential. *See, e.g., id.* at 545 n. 27, 107 S.Ct. at 2985 n. 27 ("[T]he [United States Olympic Committee] performs the distinctive, traditional governmental function of representing this Nation to the world community. But absent the additional element of governmental control, this representational function can hardly be called traditionally governmental.").

 Plaintiff contends that because the American Red Cross is authorized to perform certain functions pursuant to international treaties, and entering treaties is exclusively a governmental function, Defendant is somehow acting as the United States under the facts of this case. Plaintiff contends that the American Red Cross was acting *as* the United States Government when it allegedly issued the donation letter which several years later led the Mexican authorities to arrest and imprison Plaintiff. The Court disagrees with Plaintiff. Plaintiff has not alleged that the American Red Cross is controlled by the federal government. Nor could he. *See, e.g., Hall v. American Nat'l Red Cross*, 86 F.3d 919, 922 (9th Cir.), *cert. denied*, 519 U.S. 1010, 117 S.Ct. 516, 136 L.Ed.2d 404 (1996) ("The daily affairs of the Red Cross are not controlled by government officials."); *Irwin Mem'l Blood Bank of the San Francisco Med. Soc'y v. American Nat'l Red Cross*, 640 F.2d 1051, 1056 (9th Cir.1981) ("[I]t is settled that government officials do not direct the everyday affairs of the Red Cross.").[30] Indeed, Plaintiff could not make such an allegation because it may have ruined his RICO claim. *See, e.g., Andrade v. Chojnacki*, 65 F.Supp.2d 431, 449 (W.D.Tex.1999) (holding that governmental entities cannot be sued under RICO). Finally, Plaintiff does not allege that the government encouraged the American Red Cross to deprive Plaintiff of his liberty by issuing the "donation."

Moreover, even if the American Red Cross were a governmental actor, Plaintiff's facts still could not add up to a violation of the Fifth Amendment. *The government of Mexico*, not Defendants,

---

**30.** Plaintiff argues that *Hall* and *Irwin* are not relevant because they applied different tests and involved different federal statutes and claims than the one involved here. In that regard, the Court simply notes that those courts essentially applied the same "test," derived from *Lebron,* that the Court applies here; and that such a test is equally applicable whether examining a Fifth Amendment claim or a claim under another federal statute.

imprisoned Plaintiff. Plaintiff cannot get around that fact by contending that he never would have been arrested had Defendants not issued the alleged "donation letter." That simply is too tremendous a logical leap to accept.

In short, Defendants are neither part of the government nor a governmental actor and, therefore, cannot be liable for violations of the Fifth Amendment.

### (2) Takings

With respect to Plaintiff's Takings Clause claim, Defendants repeat their contention that Plaintiff cannot succeed for the same reasons set forth above—namely, that they are not governmental actors. The Court agrees (and will not restate the analysis).

 Defendants further contend that the American Red Cross cannot be liable because it does not possess the capacity to exercise eminent domain. The Court agrees. In order for a government actor to exercise eminent domain, that actor must have *express authority* from Congress to do so. *See Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974) (" 'The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government,' and hence recovery is not available ...."); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 866, 96 L.Ed. 1153 (1952) (holding that United States President had no authority to seize property unless expressly granted by Congress or lodged in the Constitution). In that vein. Plaintiff contends that Congress has given the American Red Cross the power "to 'have and to hold such real and *personal* estate as shall be deemed advisable.' " (Quoting 36 U.S.C. § 2). In short, the power to *hold* property (which is simply a matter of corporate form) and the power to take property as a government actor are vastly different. Those powers simply cannot be compared. Plaintiff does not allege that the American Red Cross has the power to take property—the power of eminent domain. Accordingly, the Court is of the opinion that Plaintiff's takings clause claim should be dismissed also.

After due consideration, the Court is of the opinion that Defendants' Non–RICO Motion to Dismiss should be granted in part as to Plaintiff's Fifth Amendment claims and denied as to all others.

### D. Conclusion on Motions to Dismiss

Having thoroughly reviewed the facts Plaintiff alleges in his sixty-page Fifth Amended Complaint, the Court concludes that Plaintiff has failed to state a claim upon which relief can be granted with respect to his first, third and fourth claims. Chiefly, Plaintiff cannot state a claim under RICO because of proximate cause problems and a lack of distinctiveness between the RICO person and the RICO enterprise. As to Plaintiff's Due Process and Takings claims, the American Red Cross is not a government actor capable of being liable for constitutional violations. Moreover, the American Red Cross is not authorized to take property away from private persons for public use. Hence, after due consideration, the Court is of the opinion that Plaintiff's RICO, due process and takings claims should be dismissed because Plaintiff can prove no set of facts in support of those claims that would entitle him to relief. As to all other claims. Defendants' Second Motion to Dismiss is denied.[31]

---

**31.** Initially, the Court dismissed Plaintiff's RICO, takings clause and deprivation of liberty claims with prejudice through its September 21, 2001, Order. Having had five opportunities to set out the facts of his claims, the Court doubts Plaintiff could adequately con-

## II. Motions for Summary Judgment

Defendants filed the instant Summary Judgment Motions before the Court decided their Motions to Dismiss. Accordingly, Defendants address and ask the Court to enter judgment as to all of Plaintiff's claims. Having dismissed Plaintiff's RICO, due process and takings claims, however, as discussed above, the only claims remaining are his common law claims: (1) false imprisonment, (2) conversion, (3) defamation and (4) conspiracy to defraud. Defendants attack those claims in both motions, albeit on different bases.[32]

Further, Defendants superficially attack Plaintiff's claim for civil conspiracy to defraud in their First Summary Judgment Motion based on a lack of evidence that any conspiracy ever existed. That motion chiefly addresses Plaintiff's RICO conspiracy claim. Although the Court has determined that Plaintiff cannot state a claim for RICO conspiracy because, in part, Plaintiff could not meet the RICO predicate racketeering acts requirement, the Court finds that a genuine dispute exists as to material facts of Plaintiff's common law conspiracy to defraud claim.[33] Accordingly, the Court summarily denies Defendants' Summary Judgment Motions as to Plaintiff's civil conspiracy to defraud claim.

### A. Additional Facts Pertinent to Motions for Summary Judgment [34]

Plaintiff contracted in November 1994 with the Mexican Red Cross to sell certain used medical equipment to its Mazatlan Delegation for $130,000.00. Plaintiff was paid for the equipment before the Mazatlan Delegation actually received that equipment, via a bank account that Plaintiff withdrew funds from. The parties to the transaction agreed that Plaintiff could withdraw funds so that Plaintiff could buy the equipment and hold it at Plaintiff's warehouse in El Paso. They also agreed that Plaintiff would provide invoices regarding that equipment. By December 1994. Plaintiff had withdrawn all $130,000.00.

Meanwhile, the Mexican Red Cross prepared to import the medical equipment

---

struct a sixth complaint to avoid the pitfalls of the prior five. Hence, the Court is of the opinion that leave to amend should be denied as prejudicial and futile. *See* Fed.R.Civ.P. 15(a); *See Whitmire v. Victus Ltd. t/a Master Design Furniture*, 212 F.3d 885, 889 (5th Cir. 2000) (holding leave to amend should be denied if the opposing party will be unduly prejudiced by, among other factors, repeated failure to cure deficiencies by prior amendment or futility of amendment) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962)); *see also Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 608 (5th Cir. 1998) (finding that district court did not abuse discretion where denied leave to amend to plaintiff with three failed attempts to articulate RICO claim); *Elliott*, 867 F.2d at 882–83 (noting plaintiff's "amendment should have cured deficiencies in her [RICO] pleadings" given defendant's motion to dismiss put plaintiff on notice of deficiencies in pleading).

**32.** For simplicity, then, the Court will examine both Summary Judgment Motions at the same time without distinguishing between those arguments contained in the First Summary Judgment Motion and those set forth in the Second Summary Judgment Motion. For reference, however, the Court only addresses section III of Defendants' First Summary Judgment Motion and sections III–V of Defendants' Second Summary Judgment Motion, as well as factual assertions related to both.

**33.** A civil conspiracy to defraud claim under Texas common law (explained more thoroughly below) is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *See Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). Among other things, a Plaintiff must show a meeting of the minds on the object or course of action and one or more overt act. *See id.*

**34.** Plaintiff sets forth various objections to Defendants' summary judgment evidence. Having considered those objections, the Court summarily denies them.

Plaintiff had gathered. Pursuant to a letter Cole–Isunza sent to Ruiz at the El Paso Chapter (the relevant text of which is set forth in the facts relevant to the Motions to Dismiss) asking for the American Red Cross's assistance, Ruiz prepared a "donation letter," which stated as follows: [35]

Border Customs

Cd. Juarez, Chih.

February 10, 1995

Attn. Administrator of Border Customs,

. . . .

Dear Mr. Administrator:

We wish to inform you that the Mexican Red Cross chapter at Mazatlan ... Sinaloa is receiving a donation of medical equipment.

Copy of inventory is attached.

. . . .

From the above, we are asking you for an exemption from general and/or specific taxes and necessary arrangements.

. . . .

The "inventory" attached was a copy of the list of medical equipment Plaintiff provided to the Mexican Red Cross pursuant to their arrangements. Ruiz also prepared various import-related forms and documents which list the American Red Cross as the "origin" of the goods being imported into Mexico.

At some point, Cole–Isunza made arrangements for Rauda to pick up the equipment that Plaintiff was holding in his warehouse pursuant to the parties' agreement. Rauda may have used the letter to import the equipment into Mexico without paying taxes. [36]

At some point, a dispute arose about the condition of the medical equipment. The Mexican Red Cross felt that Plaintiff had swindled them by withdrawing all of the payment but not providing working medical equipment. Plaintiff claimed the equipment was damaged in transport to Mazatlan. In August 1995, the Mazatlan Delegation filed a criminal complaint against Plaintiff, charging that Plaintiff had taken the $130,000.00 the Mexican Red Cross had put up but had not delivered the equipment covered by the agreement. They convinced a Mexican judge to issue a warrant for Plaintiff's arrest.

Plaintiff traveled to Juarez, Mexico, on April 18, 1998, upon the invitation of officials from the Mexican Red Cross. No one from the American Red Cross or the El Paso Chapter told Plaintiff to go to Mexico. Once he reached Juarez, Mexican police officers arrested Plaintiff pursuant to the warrant. They transported him to Mazatlan, where Plaintiff was held in prison pending trial.

Plaintiff had a Mexican lawyer, Jose Luis Posada Barboza ("Posada"), who represented Plaintiff before the Mexican court and during Plaintiff's trial. The Mexican judge knew that the equipment came from Plaintiff, not the American Red Cross, before the judge issued the warrant. The Mexican prosecutor also knew that the origin of the goods was Plaintiff, and he never made use of the February 10, 1995, donation letter in the trial at all. Plaintiff, however, introduced that donation letter into evidence at the trial. Plaintiff eventually was released by the Mexican officials

### B. Standard on Motion for Summary Judgment

Summary judgment should be granted only where "the pleadings, depositions, an-

---

**35.** Defendants kindly provided the Court an English-translated version of the letter, originally written in Spanish.

**36.** Although the Court need not decide whether the letter was actually used to avoid tariffs. Defendants contend Plaintiff has no evidence that it was.

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party that moves for summary judgment bears an initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavit, which it believes demonstrate the absence of a genuine issue of material fact. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet this burden, the motion must be denied, regardless of the nonmovant's response." *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). If the movant does meet this burden, however, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "If the non-movant fails to meet this burden, then summary judgment is appropriate." *Tubacex,* 45 F.3d at 954.

When making a determination under Rule 56, factual questions and inferences are viewed in a light most favorable to the nonmovant. *See Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268, 1272 (5th Cir. 1994). The party opposing a motion supported by evidence cannot discharge his burden by alleging mere legal conclusions. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Instead, the party must present affirmative evidence in order to defeat a properly supported motion for summary judgment. *See id.*

### C. *Discussion of Motions for Summary Judgment*

The relevant facts here are not in dispute. Defendants claim that Plaintiff cannot prove the elements of his claims for false imprisonment, conversion and defamation. The Court agrees.

### 1. *False Imprisonment*

Defendants contend that Plaintiff cannot succeed on this claim because Plaintiff cannot show that Defendants had anything to do with his incarceration in Mexico. Plaintiff, on the other hand, contends that Defendants had an obligation to help Plaintiff get out of that jail, and failed to do so.

A false imprisonment plaintiff must prove "(1) willful detention by the defendant, (2) without consent of the detainee, and (3) without authority of law." *Fojtik v. Charter Med. Corp.,* 985 S.W.2d 625, 629 (Tex.App.1999); *see also Sears, Roebuck & Co. v. Castillo,* 693 S.W.2d 374, 375 (Tex.1985). Where the defendant was not involved, either by participating in the arrest or directing it, the claim fails. *See Hart v. O'Brien,* 127 F.3d 424, 450 (5th Cir.1997). Even if a defendant supplied misinformation to authorities which led to the plaintiff's arrest, such a claim cannot be maintained unless the plaintiff was arrested without legal process. *See Lilley v. Minute Mkt., Inc.,* 501 S.W.2d 688, 688–89 (Tex.Civ.App.1973); *Sagebiels, Inc. v. Walker,* 498 S.W.2d 271, 273–74 (Tex.Civ. App.1973).

Here, Defendants were not the ones who arrested Plaintiff. Rather, the Mexican authorities arrested Plaintiff. Accordingly, Plaintiff cannot succeed on this claim. The Mexican Red Cross instigated the proceedings against Plaintiff in Mexico and assisted Mexican police to arrest Plaintiff pursuant to an arrest warrant that Barbosa. Plaintiff's Mexican lawyer, admitted was a valid warrant. Without determining whether the warrant, indeed, was valid under Mexican law, Plaintiff simply cannot recover for false imprisonment because Defendants were not involved with his imprisonment.

Plaintiff does not dispute Defendants' recitation of the relevant law and the application of the undisputed facts to that law. Rather, Plaintiff contends that Defendants, knowing Plaintiff was imprisoned in Mexico, had a legal duty to help "release" Plaintiff and intentionally refused to do so. In short, that argument fails because no defendant here had the power to "release" Plaintiff. Moreover, the Mexican court knew all along that Plaintiff was the "true source" of the medical equipment, not the American Red Cross. Under Plaintiff's theory, the donation letter and related exportation documents were the only thing holding up his release from prison because their falsity as to the source of the goods was the reason for his incarceration. That theory is stymied, however, by the testimony of Plaintiff's own Mexican lawyer. Barbosa, who testified in deposition that the Mexican judge knew that Plaintiff was the source of the goods before he issued the arrest warrant which led to Plaintiff's arrest. He also testified that the prosecutor there knew that fact and never used the donation letter in the trial against Plaintiff. Hence, Plaintiff's claim fails because, even if the American Red Cross had a *legal duty* to help "release" Plaintiff by admitting to the Mexican court that the donation letter and related importation documents were false (which duty the Court acknowledges only *arguendo* ), that admission would not have secured Plaintiff's release because the Mexican court already was aware of that information. Accordingly, Plaintiff's claim fails as a matter of law.

Because Plaintiff cannot prove each and every element of his claim for false imprisonment. Defendants are entitled to judgment as a matter of law and, hence, summary judgment is appropriate on that claim.

### 2. *Conversion*

Plaintiff's claim for conversion relies on the theory that Defendants wrongfully took Plaintiff's inventory list, purportedly a document of title pursuant to Texas Business and Commerce Code § 1.201(15), *see* footnote 16, *supra.* Plaintiff contends that Defendants converted that inventory list when Ruiz attached it to the donation letter and referred to it therein.

■ Under Texas law, conversion is the wrongful exercise of dominion and control over another's property which is in denial of or inconsistent with his rights in the property. *See Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 446 (Tex. 1971). There need not be a physical taking; rather, the defendant merely has to act inconsistently with the owner's rights in the property. *See In re Moody (Revie v. Smith),* 899 F.2d 383, 385 (5th Cir.1990). A plaintiff must prove that "at the time of the conversion, he was the owner of the [alleged document of title], had legal possession of it, or was entitled to possession." *Soto v. Sea–Road Int'l, Inc.,* 942 S.W.2d 67, 72 (Tex.App.1997). With respect to documents of title, a person does not own the document of title if the goods to which that document purports to present title have been sold or otherwise alienated. *See id.* at 73 (noting buyer obtains title when goods are paid for); *Bures v. First Nat'l Bank,* 806 S.W.2d 935, 938 (Tex.App. 1991) (finding bank lost ownership of certificate of origin and document of title when plaintiff paid for property the documents covered).

■ Here, Defendants' act of attaching the inventory list Plaintiff created to the donation letter had no legal effect because Plaintiff did not "own" the inventory list. By December 1994, Plaintiff had been paid in full for the equipment. Hence, Plaintiff lost title to those goods at that time, which includes any "document of title." Plaintiff

contends, however, that even if he lost title at that time, a conversion claim still exists where "use of the property departs so far from the conditions under which it was received [so] as to amount to an assertion of a right inconsistent with that of the owner." (Citing *Pierson v. GFH Fin. Svcs. Corp.*, 829 S.W.2d 311 (Tex.App. 1992)). Plaintiff misunderstands *Pierson.* There, the *owner* of certain *leased* irrigation equipment never sold the equipment. *Pierson,* 829 S.W.2d at 313. Rather, the equipment was "sold" several times as part of the land on which it was located. *See id.* The true owner sued a person who purchased only the equipment(without having purchased the land) and removed it from there. *See id.* The difference here is that Plaintiff, at one time the true owner of the medical equipment, *sold it.* He did not *lease* the equipment (which would have instilled in him the right to have the property returned at the end of the lease period). Hence, the Mexican Red Cross could do anything it pleased with both the equipment and the "document of title" that purportedly covered it, including attaching the document to the donation letter. Quite simply, Plaintiff *no longer was the owner* and, hence, whatever use became of the property (not the document of title) has no legal effect on Plaintiff as the *former* owner.

Having reviewed all of the evidence and arguments, the Court is of the opinion that Plaintiff cannot prove conversion as a matter of law and, accordingly, summary judgment for Defendants as to that claim is appropriate.

### 3. *Defamation*

Defendants also challenge Plaintiff's claim for Defamation, which Plaintiff bases on the February 10, 1995, donation letter and export documents. Defendants argue that Plaintiff cannot succeed on that claim because neither document contains any de-

famatory statement or refer to Plaintiff by name or innuendo. The Court agrees.

To prove defamation a plaintiff must show that the defendants negligently published a factual statement that was defamatory concerning the plaintiff. *See, e.g., WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998). "[A] defamatory statement . . . tends to injure the plaintiff's reputation, thus exposing him to 'public hatred, contempt, ridicule, or financial injury, or impeach his honesty, integrity, virtue or reputation.'" *Patton v. United Parcel Svc., Inc.,* 910 F.Supp. 1250, 1272 (S.D.Tex.1995) (quoting *Halbert v. City of Sherman, Tex.,* 33 F.3d 526, 530 (5th Cir.1994)): *see also San Antonio Express News v. Dracos,* 922 S.W.2d 242, 247–48 (Tex.App.1996) ("A statement is defamatory if the words tend to injure a person's reputation.") (citing TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (Vernon 1986)). "'A statement may be false, abusive, and unpleasant without being defamatory.'" *Patton,* 910 F.Supp. at 1272. (quoting *Free v. American Home Assurance Co.,* 902 S.W.2d 51, 54 (Tex.App. 1995)). Most importantly, whether words are capable of the defamatory meaning the plaintiff attributes to them is a question of law. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 654–55 (Tex. 1987). Only where the statement is ambiguous or of doubtful import should a jury be asked to determine whether the statement is defamatory. *Simmons v. Ware,* 920 S.W.2d 438, 450 (Tex.App.1996).

Here, the letter is wholly barren of any statement about Plaintiff; neither his name nor business is mentioned or referred to. Hence, Plaintiff would have to show that an ordinary person would understand that the statement referred to Plaintiff and comprehend the defamatory context. *See Musser,* 723 S.W.2d at 655. The Court is of the opinion that no ordinary

person would understand a statement contained in a business letter that does not refer to Plaintiff to be of and concerning Plaintiff. Moreover, the alleged defamatory statement is unambiguously innocuous. The simple statement that goods are being donated cannot be defamatory to an ordinary person.

Notwithstanding, Plaintiff's insistence that "insofar as [the donation letter] states that certain goods were donated, and then attaches a list of goods which were in fact purchased ... indicates that [Plaintiff] did not provide those goods in exchange for the $130,000.00 he was ultimately paid." To accept that rendition, the Court would have to find that an ordinary person would think that a person who sells equipment which thereafter is characterized to a foreign government as a donation is a dishonest person or is of questionable integrity. Plus, the Court would have to find that an average person has a grasp of the particular facts under which the American Red Cross made the statement that the transfer of goods was a donation when it really was a sale.

Plaintiff provides a convenient list of persons who, with some investigative inclination and a nose for connecting seemingly unrelated facts, might stumble across the questionable truth of the statement that the equipment was a donation. The inquiry, however, is an objective one relating to objective, average persons who would understand the defamatory context of the statement upon reading the document. While, in general, a court must examine the statement in light of the surrounding circumstances, the Court need not look beyond the entire document that contains the allegedly defamatory statement. *See Simmons,* 920 S.W.2d at 444. While the statement is false (there is no dispute about that), there is absolutely nothing in the letter referring to or implicating Plaintiff in any way. Nor does the fact that

Plaintiff actually sold the goods constitute innuendo. Even if the entire world knew that Plaintiff *actually sold* the goods instead of donating them, there is nothing within that letter which an ordinary person would consider defamatory about a statement by the American Red Cross stating that the goods are being donated.

Accordingly, the Court is of the opinion that Plaintiff cannot succeed on his defamation claim and summary judgment should enter as to that claim.

### D. Conclusion on Motions for Summary Judgment

Having thoroughly reviewed the arguments and evidence relevant to Defendants' Motions for Summary Judgment, the Court is of the opinion that Plaintiff cannot succeed on his common law claims because, as to each claim there is no factual dispute and Defendants have demonstrated that they are entitled to judgment as a matter of law. Plaintiff's false imprisonment claim fails because Defendants did not imprison Plaintiff or have a duty to help him obtain his release. His conversion claim fails because at the time of the alleged conversion, Plaintiff did not own the goods allegedly converted. Finally, Plaintiff's defamation claim fails because the accused statement neither refers to Plaintiff nor is defamatory.

Hence, after due consideration, the Court is of the opinion that summary judgment should enter as to Plaintiff's false imprisonment, conversion and defamation claims. Plaintiff's claim for civil conspiracy to defraud, however, survives Defendants' Summary Judgment Motions and, to that extent, their motions are denied.

### III. MOTION FOR JUDGMENT AS A MATTER OF LAW

The Court now considers Defendants' Motion for Judgment as a matter of Law

brought pursuant to Federal Rule of Civil Procedure 50. After Plaintiff presented all his evidence and rested, the Court heard argument at length and thereafter informed the Parties that Defendants' Motion would be granted based on Plaintiff's failure to present any evidence that any defendant made an agreement to commit any fraudulent act against Plaintiff.

### A. Facts Pertinent to Motion for Judgment as a Matter of Law

According to Plaintiff's JMOL Summary of Evidence, Plaintiff presented the following relevant evidence at trial:

i. Rauda wrote a letter dated February 2, 1995, to Don Fredell ("Fredell"), Ruiz's boss at the El Paso Chapter, asking for the El Paso Chapter's assistance with importing certain medical equipment purchased from Plaintiff for $130,000.00. Although Fredell did not remember receiving that letter, he testified that such letters are generally given to Ruiz to handle.

ii. Ruiz drafted and signed the February 10, 1995, donation letter on American Red Cross letterhead as requested, stating that the American Red Cross was donating certain medical equipment to the Mazatlan Delegation. Ruiz understood when she drafted the letter and accompanying exportation documents that her purpose was to assist Rauda to get the goods into Mexico. She knew that those documents would be provided to government officials in the United States and Mexico in order to obtain import permits from and avoid paying import taxes to the Mexican government. Ruiz knew that the inventory list attached to the donation letter was a list Plaintiff provided the Mazatlan Delegation. She kept copies of those documents in files at the El Paso Chapter.

iii. The American Red Cross had issued similar "donation" letters in the past.

iv. The exportation documents listed Rauda as the "forwarding agent." Rauda was a person involved in negotiations with Plaintiff and obtained Plaintiff's release of the medical equipment. Rauda also was listed in a March 11, 1995, letter to Plaintiff from Cole–Isunza as a person who would be acting on behalf of the Mazatlan Delegation to pick up the medical equipment from Plaintiff. Rauda and Cole–Isunza both told Plaintiff that the goods would be imported lawfully. Plaintiff relied on those representations in releasing the medical equipment.

In addition to the facts set forth in Plaintiff's JMOL Summary of Evidence, the following undisputed evidence relevant to Plaintiff's civil conspiracy claim was introduced at trial:

iv. The Mazatlan Delegation filed criminal charges against Plaintiff based on the Mazatlan Delegation's charge that Plaintiff took the $130,000.00 they agreed to pay for certain medical equipment that the Mazatlan Delegation claimed was not delivered or arrived in unserviceable condition. Plaintiff was arrested in Juarez after the Mazatlan Delegation arranged with the Juarez Delegation to lure Plaintiff to Juarez. Plaintiff was arrested in Juarez, transported to Mazatlan and imprisoned for 241 days pending trial. The prison conditions were very poor.

### B. Standard on Motion for Judgment as a Matter of Law

In general, a court can grant judgment as a matter of law where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party" on a particular issue. FED. R. CIV. P. 50(a). The Fifth Circuit provided the applicable standard of decision long ago in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969), *overruled in part on other grounds by Gautreaux v. Scurlock Marine, Inc.,* 107

F.3d 331 (5th Cir.1997). Under *Boeing,* a court "should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Id.* at 375. Though a court might decide the outcome differently than the jury, "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Id.* "A mere scintilla of evidence is insufficient to present a question for the jury." *Id.* Rather, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* Substantial evidence is defined as "evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 374. Thus, the motion should be granted only "[i]f the facts and inferences point so strongly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict." *Id.*

### C. *Discussion of Motion for Judgment as a Matter of Law*

Defendants contend that Plaintiff did not present any evidence of a conspiracy to defraud Plaintiff of anything; that even if there were a conspiracy to defraud Plaintiff, there is no evidence that any Defendant knew of the conspiracy and joined in the conspiracy; that there is no evidence that any Defendant ever made a misrepresentation to Plaintiff and that there is no evidence demonstrating that any conspiracy proximately caused Plaintiff any injury.

Plaintiff, meanwhile, insists that there was an agreement between at least Ruiz and the Mexican Red Cross to cross the medical equipment into Mexico without paying taxes, which injured Plaintiff; that the conspiracy could not have taken place were it not for the American Red Cross's involvement; and that the evidence of five past "false donations" shows that Ruiz knew what she was doing.

The Court agrees with Defendants in all respects. Below, the Court addresses the chief reasons why the evidence offered during Plaintiff's case-in-chief does not add up to a claim for civil conspiracy to defraud.

■ To prove civil conspiracy, a plaintiff must show "(1) two or more persons; (2) an object to be accomplished; (3) meeting of the minds on the end or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *See Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Civil conspiracy requires specific intent to harm. *See Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995) (rejecting argument that defendants only needed to "intend to engage in the conduct that resulted in the injury"). "The 'gist of a civil conspiracy' is the injury that is intended to be caused." *Id.* at 720 (quoting *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 856 (Tex.1968)); *see also Zervas v. Faulkner,* 861 F.2d 823, 836 (5th Cir.1988). "One 'cannot agree, either expressly or tacitly, to the commission of a wrong which he knows not of.'" *Triplex,* 900 S.W.2d at 720 (quoting *Schlumberger,* 435 S.W.2d at 857).

■ Plaintiff put forward some evidence that two or more persons made an agreement and had an illegal object in mind; Rauda, Cole–Isunza and the Mexican Red Cross agreed to avoid paying import taxes to Mexico. Ruiz may have known about that conspiracy and did something to help Rauda, Cole–Isunza and the Mexican Red Cross defraud the Mexican government. However, there is no evidence that any party intended to harm Plaintiff.

Moreover, Plaintiff spills much ink discussing Ruiz's knowledge that the medical equipment was not a donation and would enter Mexico unlawfully without taxes being paid; the prior donation letters; the letter from Cole–Isunza that stated that the Mazatlan Delegation had bought the equipment from Plaintiff; Ruiz's testimony that her purpose in writing the donation letter was to help Rauda get the goods into Mexico. Even assuming Ruiz had that knowledge, there simply is no evidence that links such knowledge to any injury to Plaintiff.[37]

■ Even if there were some evidence that Ruiz and the American Red Cross joined in a conspiracy, a civil conspiracy claim is not designed to punish people for conspiring; rather, civil conspiracy "is a derivative tort. That is, a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996) (internal citation removed). The injury must have been caused by the tort or statutory violation that the conspirator agreed with the perpetrator to bring about while intending the resulting harm. *See Triplex*, 900 S.W.2d at 720; *Schlumberger*, 435 S.W.2d at 857. Damages recoverable are those resulting from the commission *of the underlying wrong*, not the conspiracy itself. *See Triplex*, 900 S.W.2d at 720. Not only is there no principle tortfeasor in this case, Plaintiff did not introduce any evidence that he actually was defrauded.

In short, Plaintiff's claim is very similar to the claim made in the long-standing Texas Supreme Court decision, *Schlum-*

*berger*. There, the buyer of certain oil leaseholds learned that certain neighboring oil wells had drilled sideways onto the buyer's leasehold (making his leasehold much less valuable). *See Schlumberger*, 435 S.W.2d at 855. There was plenty of evidence that the defendant, an oil well servicing company, actually knew what was taking place because of a discrepancy between the actual depth of the tortfeasors' wells and the well-known depth of wells in that area (based on geological factors). *See id.* at 856. The defendant not only did nothing to stop the rogue well-drillers, the defendant *helped* those tortfeasors by developing a camouflaging billing system, advising its employees to have "poor memories" about what they had learned, and destroying certain documents which would have identified the discrepancy. *See id.* The plaintiff sued the servicing company, alleging that it had participated in a fraud against the plaintiff by committing certain unlawful acts that made the fraud possible. *See id.* Reversing the Court of Civil Appeals, which had overturned the trial court's entry of judgment for the defendant, the Texas Supreme Court stated:

> There is abundant evidence of a conspiracy such as suggested by [the plaintiff], and that the object of the conspiracy was accomplished; but only by suspicion and speculation can [the defendant] be linked to the conspiracy in two vital respects, e.g. *knowledge of the object* of the conspiracy and *intention to injure* [the plaintiff].

*Id.* (emphasis added).

■ As the Court stated during the hearing on this matter, the plaintiff in

---

**37.** Plaintiff suggests that Ruiz should have known that something was awry with the donation letter she wrote because she knew the transaction was a sale, not a donation, and because she knew Plaintiff was the vendor. To the extent that Plaintiff argues that the American Red Cross and Ruiz *should have known* that the donation letter might lead to some harm to Plaintiff, such an argument fails because one cannot conspire to be negligent or even grossly negligent. *See Triplex*, 900 S.W.2d at 720 n. 2.

*Schlumberger* had significantly more evidence to implicate that defendant in a civil conspiracy than Plaintiff has against the American Red Cross and Ruiz. Here, Plaintiff has to rely upon suspicion and speculation and pile inference upon inference upon inference in order to claim even the slightest connection between the donation letter and Plaintiff's prison-related injuries.[38] Hence, there is no evidence of any actual agreement. As *Schlumberger* demonstrates, mere involvement is not enough to hold a non-conspirator liable, even where that person acts in furtherance of a conspiracy or where the conspiracy could not have taken place without the non-conspirator's involvement. Hence, Plaintiff's argument that the American Red Cross and Ruiz should be liable because they made the alleged fraud possible, fails. Moreover there is simply no evidence that either the American Red Cross or Ruiz intended for Plaintiff to be injured in any way.

### D. Conclusion on Motion for Judgment as a Matter of Law

Because there was not more than a scintilla of evidence to present to the jury after Plaintiff was fully heard on his civil conspiracy claim, the Court granted Defendants' JMOL Motion. Even viewed in a light most favorable to Plaintiff and taking all *reasonable* inferences in his favor, there was no significantly conflicting evidence regarding whether Defendants engaged in a civil conspiracy to defraud Plaintiff. Indeed, the evidence pointed so strongly in Defendants' favor that there is no way reasonable jurors could find for Plaintiff. Accordingly, the Court is of the opinion that Judgment as a Matter of Law

should enter as to Plaintiff's common law claim for civil conspiracy to defraud.

### CONCLUSION

After five attempts, Plaintiff could not state a claim for civil RICO violations or under the Takings Clause and the Due Process Clause of the Fifth Amendment upon which relief could be granted. Chiefly, Plaintiff's RICO claim lacked certain elemental factual allegations—predicate acts and distinctiveness—and failed to indicate any proximate cause. The Red Cross is not a governmental entity for purposes of the Fifth Amendment and is not authorized to take property under eminent domain. For those reasons, the Court dismissed those claims on September 21, 2000, and reenters dismissal with explanation now.

Plaintiff's common law claims for false imprisonment, conversion and defamation fall to summary judgment. Defendants were not Plaintiff's holders and, thus, did not falsely imprison him. Plaintiff did not own the property he claims Defendants converted, and therefore cannot recover. Finally, the statement Plaintiff alleged defamed him was neither about Plaintiff nor defamatory. For those reasons, as detailed above, the Court enters summary judgment as to those claims.

Finally, Plaintiff did not produce any evidence at trial to demonstrate a conspiracy between Defendants and any other persons to perpetrate a fraud against Plaintiff. Accordingly, the Court enters judgment as a matter of law as to Plaintiff's common law claim for civil conspiracy to defraud.

---

**38.** Plaintiff also has significant proximate cause problems, which the Court has discussed *ad nauseam* throughout this memorandum opinion. Defendants restate those problems as further reason to grant the instant JMOL Motion. The Court agrees, but will not

set forth again a detailed analysis of the proximate cause problems. Essentially, Plaintiff has not shown any evidence to demonstrate that his prison-related injuries arose from the donation letter.

Accordingly, **IT IS HEREBY ORDERED** that Defendants' "Motion to Dismiss the RICO Claims of Plaintiff's 'Fifth Amended Complaint'" is **GRANTED** and Plaintiff's claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* is **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.**

**IT IS FURTHER ORDERED** that Defendants' "Motion to Dismiss the Non–RICO Claims of Plaintiff's 'Fifth Amended Complaint,'" is **GRANTED IN PART** and **DENIED IN PART,** and Plaintiff's claims for unlawful taking of property and deprivation of liberty under the Fifth Amendment to the United States Constitution are **DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.**

**IT IS FURTHER ORDERED** that Defendants' "Motion for Partial Summary Judgment on Plaintiff's Fifth Amendment, Conversion, Defamation and False Imprisonment Claims" is **GRANTED IN PART** as to Plaintiff's claims for conversion, defamation and false imprisonment.

**IT IS FURTHER ORDERED** that Defendants' "Motion for Partial Summary Judgment" is **GRANTED IN PART** to the extent that Defendants seek judgment regarding Plaintiff's false imprisonment, conversion and defamation claims and **DENIED IN PART** as to all other claims.

**IT IS FURTHER ORDERED** that Defendant's "Motion for Judgment as a Matter of Law" is **GRANTED.**